## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| UNITED STATES OF AMERICA, | |
|---|---|
| v. | No. 3:18cr318 (MPS) |
| ANA NUNEZ | |

## FINDINGS FOLLOWING *FATICO* HEARING

Ana Nunez operated a tax preparation business, Nunez Multi Services LLC, in Naugatuck. The business also sold cell phones and provided immigration counseling services.  After customer complaints, the IRS discovered a mismatch between tax returns filed by Ms. Nunez on behalf of clients and client copies of the same returns, and initiated an investigation.  The grand jury later returned an indictment against Ms. Nunez, charging her with multiple counts of aiding and assisting the preparation of a false tax return in violation of 26 U.S.C. § 7206(2).  ECF No. 41. The superseding indictment charged that Ms. Nunez falsified income on her clients' Schedule C forms in order to claim the benefit of certain tax credits and falsified expenses.  *Id.* at ¶ 2.  It also alleged that she falsified expenses and credits on the filed returns to increase the client's refund amount beyond what was reflected on the client's hard copy and then diverted the excess refund (based on the falsified expenses and credits) to be deposited into her own account, while keeping the amount of refund going to the client the same as on the client's hard copy return.  *Id.* at ¶ 3. According to the indictment, the defendant falsified returns as to taxpayers L.R. (counts 1-3); W.V. (counts 4, 5), A.C. (counts 6, 7), and R.R., an undercover agent (count 8).

On January 7, 2020, Ms. Nunez appeared before me and entered a plea of guilty to counts 1 and 8 of the superseding indictment.  ECF No. 48-1.  The parties dispute the calculation of the correct offense level under the U.S. Sentencing Guidelines.  Specifically, the parties dispute

whether an obstruction of justice enhancement under U.S.S.G. § 3C1.1 is warranted based on the Government's claim that (1) Ms. Nunez falsified invoices that were provided to the Government during the pretrial discovery process and (2) attempted to intimidate or influence her brother, Juan Carlos Nunez, to support her version of events. The parties also disagree as to the amount of tax loss. I held a *Fatico* hearing on April 12, 13, and 14, 2021 after which the parties filed post-hearing briefs. ECF Nos. 103, 104. This memorandum sets forth my factual findings based on the *Fatico* hearing and the implications of those findings under the Guidelines.

## I.       Obstruction of Justice

"Under the Guidelines, a defendant is to have her offense level increased by two steps if she 'willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense.' Guidelines § 3C1.1." *United States v. Cassiliano*, 137 F.3d 742, 745 (2d Cir. 1998). The commentary to Section 3C1.1 provides a non-exhaustive list of conduct to which this adjustment applies, including "producing or attempting to produce a false, altered, or counterfeit document or record during an investigation or judicial proceeding" and "threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so." Application Notes 4(A), (C). Before imposing the enhancement, the court "must find that the defendant consciously act[ed] with the purpose of obstructing justice . . . ." *United States v. Anderson*, 201 F.3d 432 (2d Cir. 1999) (internal quotation marks and citations omitted). "The facts necessary to support an obstruction-of-justice enhancement need be proven only by a preponderance of the evidence." *Cassiliano*, 137 F.3d at 747. "In determining the intent with which a defendant acted, the district court is entitled to rely on circumstantial evidence and on all reasonable inferences that may be drawn from all of the evidence." *Id.*

2

A.      False Invoices

Ms. Nunez's trial was scheduled to begin February 5, 2020.  ECF No. 31.  In anticipation of trial, on November 26, 2019, her attorney produced to the Government six invoices from Ms. Nunez that purportedly concerned three of the taxpayers at issue in the indictment:  A.C., W.V., and L.R.  Gov't Ex. 8.  Specifically, Ms. Nunez provided:

-an invoice for Ann Colato ("A.C.") from "Nunez Multiservices Cell Phone Store" in the amount of $655 for a Samsung 3 cell phone.[1]   The invoice has typed notes stating "JUAN [CARLOS] APPROVED THE SALE" and "PAID WITH TAX REFUND APPROVED BY ANA [NUNEZ]."  The words "Received 3/10/12 JC" are handwritten across the invoice.  Gov't Ex. 8, ANUNE-000005.

-an invoice for Ann Colato from "Nunez Multiservices Cell Phone Store" in the amount of $448 for an iPhone 5 cell phone.  The invoice has typed notes stating "JUAN APPROVED THE SALE 02/10/13" and "PAID WITH TAX REFUND APPROVED BY ANA."  The words "Received 2/28/13 JC" are handwritten across the invoice.  Gov't Ex. 8, ANUNE-000006.

-an invoice for Marina Ruiz Martinez from "Nunez Multiservices LLC Tax and Immigration Services" for immigration services in the amount of $3048 with a handwritten note "Paid in Full on 3/16/12 (1663 with Luis [Ruiz "LR"] refund . . . .").  Gov't Ex. 8, ANUNE-000007.

-an invoice for Marina Ruiz Martinez from "Nunez Multiservices LLC Tax and Immigration Services" for immigration services and fees in the amount of $1090.  Handwritten across the invoice is the following: "$600 on 3/2/13 from Luis Refund" and "$450 from Luis refund (3/1/14)."  Gov't Ex. 8, ANUNE-000008.

---

[1] The same document lists the "subtotal" and "total" as $648.

-an invoice for Wanda Velez ("W.V.") from "Nunez Multiservices Cell Phone Store" in the amount of $750 that has typed notes stating "JUAN APPROVED THE SALE 01/16/2012" and "PAID WITH TAX REFUND APPROVED BY ANA." Handwritten across the invoice is the following: "Recibido el 2/22/12 Ana me dio $750 JC." Gov't Ex. 8, ANUNE-000009.

-an invoice for Wanda Velez from "Nunez Multiservices Cell Phone Store" in the amount of $617 for an iphone and accessories with typed notes stating "JUAN APPROVED THE SALE 01/21/2013" and "PAID WITH TAX REFUND APPROVED BY ANA." Handwritten on the invoice is the following: "Recibido por Joel 2/18/13 Pago total Mariely." Gov't Ex. 8, ANUNE-000010.

The invoices were provided in an apparent attempt to justify the discrepancy in the returns charged in the indictment because they suggest that some of the additional monies from the apparently inflated tax refunds that Ms. Nunez arranged to be deposited in her account were for other services such as cell phone purchases and immigration services. *See* ECF No. 53 at 9. The Government does not dispute that Ms. Nunez offered such additional services. But the Government contends, and the evidence it adduced at the hearing demonstrates by a preponderance of the evidence, that the invoices Ms. Nunez gave to the Government in pretrial discovery are false and that she either fabricated them or caused them to be fabricated.

The Government presented the testimony of Ann Colato, whose name appeared on two of the invoices at issue. Gov't Ex. 8, ANUNE-000005 and ANUNE-000006. Ms. Colato was a customer of Ms. Nunez's tax preparation business. *Fatico* Tr., ECF No. 98 at 125, 126. She denied ever purchasing a cell phone from Ms. Nunez or her business. *Id.* at 134. She also denied ever giving Ms. Nunez permission to take money from her tax refund to pay for a cell phone. *Id.* Ms.

Colato explained that she purchased her cell phone from her "regular store provider," Sprint, at the mall. *Id.* I find her testimony wholly credible.

The Government also presented the testimony of Marina Ruiz Martinez and her son, Luis Ruiz, concerning the two invoices in Ms. Martinez's name for purported immigration services Ms. Nunez provided her. The invoices indicate that the services were paid for, in part, by the application of Luis Ruiz's tax refunds. Gov't Ex. 8, ANUNE-000007 and ANUNE-000008. Ms. Martinez testified that she has known Ms. Nunez since 2006 and Ms. Nunez assisted Ms. Martinez with her taxes and immigration paperwork. *Fatico* Tr., ECF No. 97 at 107. Ms. Nunez did not charge her for the immigration services, which at the time consisted of renewing her temporary protected immigration status ("TPS"). *Id.* at 109. In 2009, Ms. Martinez hired Ms. Nunez to help Ms. Martinez apply for legal residency. *Id.* at 110. Ms. Nunez charged Ms. Martinez about $800 for that task and did not give Ms. Martinez an invoice. *Id.* at 111. Ms. Martinez told Ms. Nunez to take the $800 out of Ms. Martinez's tax refund. *Id.* Ms. Nunez did not give her a receipt. *Id.* That was the only time Ms. Martinez ever used tax refund money to pay Ms. Nunez for immigration-related services. *Id.* at 111. From 2009 through 2016, Ms. Nunez assisted Ms. Martinez by filling out her "TPS" paperwork to renew her immigration status. *Id.* Ms. Nunez did not charge her for that work. *Id.* at 112. Ms. Martinez gave Ms. Nunez cash to pay the Government certain fees with the renewal paperwork. *Id.* at 112-13. Ms. Martinez denied that Ms. Nunez ever charged her $3000 or $1090, the amounts on the invoices at issue. *Id.* at 115. Ms. Martinez also credibly denied ever speaking to Ms. Nunez about using her son Luis Ruiz's tax refunds to pay for the immigration services Ms. Nunez provided. *Id*.

Luis Ruiz's testimony similarly was straightforward and credible. He testified that he and his mother went to Ms. Nunez's business to have their tax returns prepared. *Fatico* Tr., ECF No.

98 at 96-97.  Mr. Ruiz stated that he did not speak to either his mother or Ms. Nunez about using tax refunds to pay for immigration services.  Id. at 112-113.  Mr. Ruiz never told Ms. Nunez that she could take money from his tax refund to pay for immigration services.  *Id.* at 112.

Mariely Serrano, a former employee of Ms. Nunez, also testified.  *Fatico* Tr., ECF No. 99 at 7.  She worked for Ms. Nunez at Nunez Multiservices from 2013 until 2015.  *Id.* at 7.  She sold phones, answered calls, and made appointments for tax return preparation.  *Id.* at 8-9.  She testified that customers paid for the cell phones with cash or a credit card.  *Id.* at 17.  She could not remember if customers were given receipts when they paid in cash.  *Id.*  When customers paid with a credit card, the credit card machine printed out a receipt that the customer then would sign.  *Id.* She testified that Ms. Nunez never provided her with money from a client's tax return to pay for a cell phone.  *Id.* at 18.  When shown the invoices Ms. Nunez produced to the Government, Ms. Serrano credibly testified that she had never seen invoices like those.  *Id.* at 18.  As to the invoice for Wanda Velez on which Ms. Serrano's name - Mariely - was handwritten, Gov't Ex. 8, ANUNE-000010, Ms. Serrano credibly denied that it was her handwriting.  *Fatico* Tr., ECF No. 99 at 18. She further testified that she did not recognize the handwriting.  *Id.* at 23, 24.[2]

Another employee, Juan Carlos Nunez, Ms. Nunez's brother, also testified.  Mr. Nunez came to United States in 2009 from the Dominican Republic and has legal residency.  *Fatico* Tr., ECF No. 97 at 10.  He does not read or write English. *Id.* at 70.  He worked for Ms. Nunez from 2010 to 2012.  *Id.* at 11.  He did not work for her in 2013 because they had a falling out.  *Id.* at 26.

---

[2] Although Ms. Serrano testified at one point that she did not begin working for Ms. Nunez until "late 2013," which would mean she was not employed by Ms. Nunez on the date of the invoice on which her name appeared, she later said she was unsure about the date and could not remember exactly when in 2013 she started working there.  *Id.* at 19.  Because her testimony about the date she began working for Ms. Nunez was vague and uncertain, I do not find that aspect of her testimony persuasive.  This does not, however, detract from the credibility of other aspects of her testimony.

He returned in 2014 and worked for her from 2014 to 2017 during tax season. *Id.* at 11. In 2010, Ms. Nunez told him that she would put the cell phone business in his name to assist with his wife's immigration process. *Id.* at 20. Although the business was in his name, it was Ms. Nunez who ordered the cell phones and received the money when customers paid for cell phones. *Id.* at 21. If he had questions about the price of a cell phone, he asked Ms. Nunez. *Id.* at 22. He credibly testified that he was not aware of people using their tax refunds to pay for their cell phones. *Id.* at 22-23. He did not work for Ms. Nunez in 2013, the year in which three of the invoices – Gov't Ex. 8, ANUNE-000006, ANUNE-000008, and ANUNE-000010 - are dated. *Fatico* Tr., ECF No. 97 at 26, 32, 33. He credibly testified that he never saw any documents that looked like the invoices at issue. *Id.* at 27. Mr. Nunez denied approving the sale of a cell phone that was paid for by a tax refund. *Id.* at 29, 31. He further testified that the handwriting on the invoices was not his. *Id.* at 28, 30, 32.

The Government also introduced evidence that the phone listed on the invoices for Ms. Colato and Ms. Velez - the Samsung Galaxy S3 - was not commercially available until months *after* the dates on the invoices. Gov't Ex. 9; *Fatico* Tr., ECF No. 97 at 133-35.

I find that the invoices that Ms. Nunez gave to her attorney to be used in her defense are false.[3] Two employees who worked for Ms. Nunez, Ms. Serrano and Mr. Nunez, both denied ever

---

[3] Ms. Nunez does not dispute that the invoices for the Samsung 3 phones are false. ECF No. 104 at 14. She asserts, however, that there "simply is no proof that [she] is the party who prepared them." ECF No. 104 at 13. But direct evidence is not required. It is well settled that a sentencing court may rely on either direct or circumstantial evidence to resolve disputed facts relevant to sentencing. *See United States v. Cassiliano*, 137 F.3d 742, 747 (2d Cir. 1998) ("In determining the intent with which a defendant acted [for purposes of applying obstruction enhancement], the district court is entitled to rely on circumstantial evidence and on all reasonable inferences that may be drawn from all of the evidence.") The evidence presented by the Government showed that Ms. Nunez owned the business and made all key decisions about ordering of cell phone supplies, pricing, hiring of employees, and preparing tax returns. There is no dispute that her lawyer forwarded the invoices to the Government. See Gov't Ex. 8 (attorney's cover letter to government

seeing invoices such as those at issue.  And Ms. Colato and Ms. Martinez denied authorizing the use of their tax refunds to pay Ms. Nunez as the invoices indicate.  Finally, there is compelling evidence that the cell phone model listed on the invoices was not available for purchase on the date of the invoices.  The Government has met its burden of proving by a preponderance of the evidence that Ms. Nunez either created the fictitious invoices or caused their creation and that she acted consciously with the purpose of obstructing justice by attempting to mislead the Government in the pretrial discovery process.

      **B.**     **Witness Intimidation**

      The Government argues that there is a second basis upon which I should apply the enhancement for obstruction of justice - that Ms. Nunez attempted to intimidate or influence her brother, a potential witness.  In support, the Government presented Mr. Nunez's testimony, a recorded conversation he had with Ms. Nunez, and text messages Ms. Nunez sent him.

      Mr. Nunez testified that in 2018, he found out that there was a criminal case against Ms. Nunez.  *Fatico* Tr., ECF No. 97 at 34.  Ms. Nunez told him that her ex-husband, Joel, "went to the IRS and was saying bad things." *Id.* at 35.  She told Mr. Nunez that he would have to go see her lawyer. *Id.* at 36.  In 2019, she started pressuring Mr. Nunez to see her lawyer. *Id.*  Ms. Nunez told her brother that it was a "federal case" and that if he did not go to see her lawyer, "they" would come looking for him at his job, put him in jail, and deport him. *Id.* at 36.  He believed her because she knew about immigration. *Id.* at 37.  Because he was not a citizen at the time, he became "really concerned." *Id.* at 37.  Ms. Nunez had these conversations in front of his family. *Id.* at 38.  To avoid going to prison and being deported, she proposed that Mr. Nunez "go to her lawyer and do

---

indicating materials "which Ms. Nunez located in her files.")  There has been no suggestion that anyone besides her and her lawyer were involved in her defense of the case.  Thus, the evidence creates a reasonable inference that Ms. Nunez created the invoices or arranged to do so.

what they said or she said." *Id.*  Mr. Nunez did not want to meet with Ms. Nunez's lawyer and gave her excuses as to why he could not go.  *Id.* at 39.  He was "really concerned and desperate." *Id.* at 40.  His daughter went online and told him that the case was only against Ms. Nunez.  *Id.* at 41

On October 20, 2019, he recorded a conversation he had with Ms. Nunez.[4]  *Id.* at 46; Gov't Exs. 57, 57A.  After telling Mr. Nunez's daughter to move away because Ms. Nunez did not want her to hear the conversation, Ms. Nunez told Mr. Nunez that "You have to go with me to see the lawyer."  Gov't Ex. 57A at 6.  Ms. Nunez said that "I'm going to tell you what's what" and went on to say that her ex-husband Joel "got me involved in every single crazy thing possible. And he got me involved in the fact that they were selling cell phones there . . . . stolen ones, OK?"  Gov't Ex. 57A at 7.  Ms. Nunez complained that Mr. Nunez had not met with her lawyer even though she had made appointments for him to do so.  Gov't Ex. 57A at 9.  She pressed him for a date when he would go, telling him "look, this is the problem.  At this point, there have been two appointments. You have not shown up for any of the appointments.  I gave my statement; I did what I had to do. They can't find a second person who can support what I'm saying, about what you were doing there, according to my version. OK?"  *Id.* at 9-10.  She emphasized that "If you don't go and support that same version, they're going to charge you.  That is what is going on.  So, you tell me now, when they charge you, what are you going to do?"  *Id.* at 10.  When Mr. Nunez demurred and said he couldn't go to meet her lawyer, Ms. Nunez retorted "So, you don't think it would be worse if they show up at your job tomorrow?"  *Id.* at 11.  She went on to say "what you're doing

---

[4] The conversation, which was conducted in Spanish, was transcribed and translated.  Gov't Ex. 57A.

is dragging this case into a worse situation." *Id.* When Mr. Nunez repeated that he couldn't go on

Friday, Ms. Nunez said "[l]et them do whatever they have to do." *Id.* at 13.

But Ms. Nunez did not let up. The day after the recorded conversation, she texted Mr.

Nunez asking him when he could "talk to the lawyer and for the prosecutor to take your statement."

*Fatico* Tr., ECF No. 97 at 59. Later the same day, Ms. Nunez texted him

> I want to know what you're waiting for in order to eat [sic] this problem [is] serious
> now some federal agent came to my house today to ask me questions about you
> when they connect all of the dots and you're facing a big problem don't blame me,
> this problem isn't going to go away when we wake up tomorrow, and the
> consequences will be fewer if we have the same story.

Gov't Ex. 58A at 2; *Fatico* Tr., ECF No. 97 at 59. Mr. Nunez understood this to mean that if he

supported her version, "the consequences for [him] would be minor." *Fatico* Tr., ECF No. 97 at

61. That evening, Ms. Nunez texted Mr. Nunez that some men, whom Mr. Nunez understood to

be federal agents, had gone to the homes of some of her customers "to ask about you." Gov't Ex.

58A at 3; *Fatico* Tr., ECF No. 97 at 61. She forwarded Mr. Nunez a text she purportedly had

received from someone who asked Ms. Nunez "Ana, hon, what happened  what did you and your

brother find out[.]" Gov't Ex. 58A at 5; *Fatico* Tr., ECF No. 97 at 63. The text further stated:

> I couldn't sleep last night those people cornered me asking me questions and I don't
> want any problems. I care about you and your brother a lot and I don't want any
> problems. They told me that, if necessary, they want me to go to court to identify
> him. I don't want any problems.

Gov't Ex. 58A at 5. When Mr. Nunez told his sister he had met with a lawyer, she responded that

there was nothing to talk about and that she was going to go her "own way." Gov't Ex. 58A at 6.

Ms. Nunez told her brother that her "lawyer and the detective were simply giving you the chance

to cooperate [about] what I told them . . . ." *Id.* at 7. About a month later, on November 19, 2019,

Ms. Nunez texted Mr. Nunez that he had an appointment to meet with "the detective" and "[i]f you

want we could meet beforehand to go over how things were done at the cell phone store and what I told them."  Gov't Ex. 58A at 9.

The Government presented evidence that Ms. Nunez's statements to her brother that agents were looking for him and that he was facing charges were false.  Agent LaBounty testified that Mr. Nunez was never a target in the case, that he was not under investigation for stolen phones, and that Agent LaBounty did not go to the homes of individuals identified in Ms. Nunez's text message to ask about Mr. Nunez.  *Fatico* Tr., ECF No. 97 at 127, 129.  He also denied telling anyone that it would be necessary to go to court to identify Mr. Nunez.  *Id.* at 130.

Ms. Nunez argues that the Government has not met its burden of establishing that she unlawfully intimidated or influenced her brother.  Ms. Nunez does not contest that she pressured Mr. Nunez to meet with her attorney.  ECF No. 104 at 12.  But that falls short, she contends, because Mr. Nunez did not testify as to what exactly she wanted him to say to her lawyer.  See *Fatico* Tr. ECF No. 97 at 92 (Q: "And what did she want you to say?" A: "I don't know.")  I am not persuaded.  The evidence presented makes clear that Ms. Nunez pressured her brother in order to get him to "support" her version and tell the "same story" as she did.  Gov't Ex. 58A at 2, 10.  And she bolstered her messages with intimidating statements that federal agents were looking for him, would put him in jail, and deport him.  She explicitly told him that if he did not "support that same version, they're going to charge you. "  Gov't Ex. 57 A at 10.  Simply because her brother did not know (or did not remember) specifically what she wanted him to say – a gap that Ms. Nunez offered to fill by "meet[ing] beforehand to go over how things were done at the cell phone store and what I told them," Gov't Ex. 58A at 7 – does not suggest that Ms. Nunez did not "intimidate[e] or otherwise unlawfully influenc[e] a . . . witness" or "attempt[] to do so." U.S.S.G. 3C1.1, App. Note 4(A).  I find that the Government has proven by a preponderance of the evidence

that Ms. Nunez acted consciously with the purpose of obstructing justice by attempting to intimidate and unlawfully influence her brother, a potential witness.

## II.     Tax Loss

The Government also presented evidence at the *Fatico* hearing as to the tax loss it contends should apply.  Under the Sentencing Guidelines, the base offense level for a tax fraud offense derives from the amount of loss that is the object of the offense.  U.S.S.G. § 2T1.4 (Aiding, Assisting, Procuring, Counseling, or Advising Tax Fraud) and § 2T4.1.  The commentary to § 2T1.4 refers to "the general principles underlying the determination of the tax loss," citing, among others, Application Note 1 of the Commentary to U.S.S.G. § 2T1.1.  That Application Note states that when the tax loss is "uncertain," the court may "simply make a reasonable estimate based on the available facts."  U.S.S.G. § 2T1.1 App. Note 1.

The Government determined its proposed tax loss by (1) calculating losses from returns of taxpayers it interviewed ("actual loss") and (2) extrapolating to the larger set of returns prepared by Ms. Nunez.

### A.     Actual Loss

Ms. Nunez filed approximately 6,000 tax returns between 2010 and 2016, the years under investigation.  ECF No. 97 at 151-52.  The IRS interviewed 52 taxpayers and analyzed 209 tax returns of these taxpayers for tax years 2010 through 2016.  *Fatico* Tr., ECF No. 97 at 155; ECF No. 98 at 57.  These "interviewed returns" included both Schedule C and non-Schedule C returns. *Fatico* Tr., ECF No. 97 at 160.  The IRS calculated the actual tax loss reflected in the interviewed returns "by adding up the total tax losses that were computed based on comparing the witness's

statement to what was actually filed." *Id.* at 154.  The interviewed federal loss is $350,722,[5] Gov't Ex. 1B, and the interviewed state loss is $48,820, Gov't Ex. 2A, for a total interviewed (actual) loss of $399,542.  Gov't Ex. 1B.[6]

**B**      **Schedule C Extrapolated Loss**

The Government went on to use extrapolation to estimate additional tax loss as to other returns that included a Schedule C.[7]  The extrapolation calculation was based on a non-random sample of taxpayers selected by Agent LaBounty who had Schedule C returns with a profit.  *Fatico* Tr., ECF No. 98 at 82.  Agent LaBounty testified that he interviewed taxpayers for a total of 138 such returns, of which  97 returns were false.  *Id.* at 89.  The average loss per Schedule C return was $1479.[8]  *Id.* at 39, 40.  Agent LaBounty then multiplied the average loss by 1470, the number of Schedule C returns that were not interviewed, to arrive at $2,174,130 in extrapolated federal Schedule C loss for the non-interviewed Schedule C returns prepared by Ms. Nunez.  *Id.* at 40; Gov't Ex. 5A.  He determined the extrapolated state Schedule C loss was $441,348, 20.3% of the extrapolated federal loss.[9]  *Id.*  The total extrapolated Schedule C loss (federal and state) was $2,615,478.  *Id.* at 41.  To obtain the total loss, the Government added in the actual loss of $399,542 to the extrapolated loss of $2,615, 478 for a total loss of $ 3,015,020.  Gov't Ex. 1A, 1B.  Under

---

[5] The initial federal interviewed federal loss was $351,522.97.  *Fatico* Tr., ECF No. 97 at 160; Gov't Ex. 1, 2A.  At the *Fatico* hearing, IRS Agent LaBounty testified that this number reflected an overstatement of $800.  *Fatico* Tr., ECF No. 98 at 35, 36.  The Government revised its interviewed loss figures accordingly, deducting the $800.  Gov't Ex. 1B (reflecting adjustment).
[6] Ms. Nunez did not challenge these figures either in her initial response to the Government's presentation, ECF No. 53, or in her post-hearing submission.  ECF No. 104.
[7] Extrapolation was used only for Schedule C returns.  *Fatico* Tr., ECF No. 98 at 59.
[8] This was calculated by dividing the total Schedule C loss revealed by the taxpayer interviews, $204,136, by 138, the number of interviewed Schedule C returns.  *Fatico* Tr., ECF No. 98 at 58.
[9] This 20.3% figure is the ratio of the state Schedule C loss of interviewed returns to the federal Schedule C loss of the interviewed returns.  *Fatico* Tr., ECF No. 98 at 40.

the sentencing guidelines, this amount of tax loss, more than $1,500,000 and less and 3,500,000, results in a base offense level of 22.  § 2T4.1(I).

### C.      After the *Fatico* Hearing

At the close of the *Fatico* hearing, I set deadlines for the submission of simultaneous post-hearing briefs.  I also alerted the parties to my concern that the sample upon which the extrapolation was based was not random.  *Fatico* Tr., ECF No. 99 at 39.  I brought to the parties' attention *United States v. Archer*, 671 F.3d 149 (2d Cir. 2011), which, although not a tax case, suggested that to constitute a reliable basis on which to extrapolate to a larger set, a sample must be randomly selected.  *Id.* at 163.

Although the Government did not concede in its post-hearing submission that its extrapolation methodology was flawed because it was not based on a random sample, it stated that, after my comments, it had conducted additional interviews of 30 Schedule C taxpayers with respect to a total 56 Schedule C returns.[10]  ECF No. 103 at 27.  This set of returns, the Government maintained, was randomly selected.   The Government then set forth in its post-hearing memorandum new calculations of actual and extrapolated tax loss associated with those tax returns and proposed that I adopt those figures for sentencing purposes.  ECF No. 103 at 37-38.

For the group of interviewed taxpayers in the post-hearing group, the Government calculated that the actual loss was $181,220 ($151,211 federal loss and $30,009 state loss).  Gov't Ex. 1B.  As for its proposed extrapolated Schedule C loss, the Government calculated the federal loss as $2,682,918 and the state loss as $558,047 for a total extrapolated Schedule C loss of $3,240,965, which was larger than the Government's initial calculation of $2,615,478.[11]  Compare

---

[10] The Government did not seek to re-open the evidentiary hearing.
[11] According to the Government, this was because the average loss was higher in the second set of returns.  ECF No. 103 at 31.

Gov't Ex. 5B with Gov't Ex. 1A.  When the Government folded in the actual losses from the initial and second group of taxpayers, the total tax loss was $3,821,727.  *See* ECF No. 103 at 37-38. Because the tax loss exceeds $3,500,000, the Guidelines calculation changed from a base offense level of 22 to a base offense level of 24.  § 2T4.1(J).

Unsurprisingly, Ms. Nunez protests that I should not consider the Government's submission as to the second set of taxpayers because "it neither sought nor obtained permission to supplement the record made at the three-day hearing."[12]  ECF No. 104 at 10.

Although I find the timing issue Ms. Nunez identifies concerning, I find more significant the fact that, even though the Government was on notice of authority indicating that extrapolation should be applied to a random sample, it has not submitted any evidence about the sampling technique it used to select this new group of taxpayers upon which its extrapolation is premised. The Government offers a single sentence in its brief in which it asserts, without more, that the sample was randomly generated by a computer program.  ECF No. 103 at 31 ("An IRS Revenue Agent trained in statistical sampling reduced the 1,448 Schedule C returns with a profit to a list of unique individual taxpayers, from which a computer program randomly selected 30 taxpayers."). It provides no information about the computer program or how the program selected the taxpayers. There is no affidavit attesting to how the randomized sampling technique operates.  Further, because the sampling was performed after the conclusion of the *Fatico* hearing, Ms. Nunez has not had an adequate opportunity to challenge it and I have not had an opportunity to ask questions about it.  Even in cases in which the Second Circuit has approved reliance on Government estimates at sentencing, there has been some evidence to support a finding that the estimates are

---

[12] Ms. Nunez does not request another hearing to address the new calculations advanced by the Government.  ECF No. 104 at 10.

reliable.  *See, e.g., United States v. Reese*, 33 F.3d 166, 174 (2d Cir. 1994) (district court could rely on mortgage fraud estimate set forth in Government exhibit introduced at *Fatico* hearing, because, although the exhibit was hearsay, a government investigator testified that the information contained in the exhibit was derived from his investigation).  On this record, I do not find that there is reliable evidence to support the use of the Government's new extrapolation data.

Nor do I find in light of *United States v. Archer* the Government's initial extrapolation based on a non-random sample sufficiently reliable to make inferences about the amount of tax loss for the broader universe of Schedule C returns.  In *Archer*, an immigration attorney who had been convicted of submitting fraudulent visa applications on behalf of clients received an enhancement at sentencing for having participated in an offense involving more than 100 fraudulent documents.  671 F.3d at 162.  At trial, there was evidence of four false applications.  The Government also presented evidence that Archer had submitted a total of 175 visa applications, and expert testimony of a Homeland Security officer as to certain "oddities" which, in his opinion, suggested that the applications were fraudulent.  *Id.* at 156-57.  Based on this evidence, the district court applied an enhancement for conduct involving more than 100 fraudulent documents.  *Id.* at 158.  The Second Circuit held that this was error because the four applications "were not randomly selected from the population," and the government presented no evidence that the four applications proven false at trial were a representative slice of the 175 applications on which the government relied.  *Id.* at 163.  Here, too, there is insufficient evidence that the sample used as a basis for extrapolation is sufficiently representative of the larger set of Schedule C returns.

This leaves the Government's evidence as to the actual loss it derived from the initial and post-*Fatico* hearing set of interviewed taxpayer returns, evidence which I find to be reliable.

U.S.S.G. § 6A1.3, Commentary ("Any information may be considered [by the Court in determining the facts relevant to sentencing], so long as it has sufficient indicia of reliability to support its probable accuracy.")  As a result, I find that the applicable tax loss in this case is the aggregate of the actual interviewed losses of $399,542 and $181,220, for a total tax loss of $580,762.  Under the applicable guidelines, this results in a base offense level of 20.  § 2T4.1(H).

## III.    CONCLUSION

Based on the findings of fact set forth above, at sentencing, I will apply a two point obstruction of justice enhancement and use a tax loss of $580,762.

IT IS SO ORDERED.


_____/s/_____
Michael P. Shea, U.S.D.J.


Dated:        Hartford, Connecticut
              November 23, 2021